126 So.2d 680 (1961)
Succession of Ludovic J. VICKNAIR and Marie Vempren, his Wife.
No. 34.
Court of Appeal of Louisiana, Fourth Circuit.
January 23, 1961.
Rehearing Denied February 20, 1961.
Certiorari Denied April 7, 1961.
*681 Graham & Graham, Louis B. Graham and J. B. Kiefer, New Orleans, for plaintiffs and appellees.
Bryan J. Lehmann, Jr., Norco, for defendant and appellant.
*682 McBRIDE, Judge.
This is a suit instituted by the brothers and sister of Ludovic J. Vicknair and the brothers and sisters of Mrs. Marie Vempren Vicknair, his wife, to annul and avoid the last wills and testaments of Mr. and Mrs. Vicknair which have heretofore been admitted to probate herein. The petitioners allege they are the sole and only heirs at law of said decedents and pray for recognition as such.
Ludovic J. Vicknair executed his will in the olographic form, i. e., entirely written, dated and signed by himself, on February 10, 1955, instituting defendant, Mary Virginia Marino Georgel, universal legatee and designating Bryan J. Lehmann, Jr., his executor. Vicknair died November 9, 1955.
Marie Vempren Vicknair executed her last will and testament, which is said to be in the nuncupative form by public act, on February 10, 1955, before Bryan J. Lehmann, Jr., Notary Public for the Parish of St. Charles, instituting the same universal legatee and naming the same executor. She died January 26, 1956.
Ludovic J. Vicknair's will is assailed on the grounds, first, that it does not conform to the form required by law; second, that the so-called will conveys nothing to the legatee; third, that the signature thereon is not the testator's; and, fourth, that said will was made at the same place, on the same date, and at the same time as the will of Mrs. Vicknair, and whereas Mary Virginia Marino Georgel was instituted as the universal legatee by both the said testator and said testatrix, said wills contain a reciprocal or mutual disposition which is reprobated by law. In the alternative, petitioners allege that Ludovic J. Vicknair could not execute a valid will because he was in a "comatose condition" and incapable of writing a will or of understanding a testamentary act.
The last will and testament of Marie Vempren Vicknair is in the following language:
"Last Will and Testament
"United States of America "State of Louisiana "Parish of Saint Charles
"Know All Men By These Presents, that on the 10th day of February, in the year Our Lord, One Thousand, Nine Hundred and Fifty-Five (1955) and of the Independence of the United States of America, the One-Hundred and Seventy-Ninth,
"Before Me, Bryan J. Lehmann, Jr., a Notary Public, duly commissioned and qualified, in and for the Parish of Saint Charles, State of Louisiana, and therein residing, and in the presence of the five named and undersigned witnesses, all competent witnesses of legal age, residents of the Parish of Saint Charles, who speak and understand the English Language,
"Personally Came and Appeared, Marie Vempren, wife of Ludovic J. Vicknair, whom I know her well to be a resident of the Parish of Saint John the Baptist, State of Louisiana, and of apparent sane and disposing mind, who declared unto me, Notary, that she desired me, Notary, in the presence and hearing of the five named and undersigned witnesses, to receive her last will and testament:
"And then and there, the said Marie Vempren Vicknair dictated unto me, Notary, in the English Language, and in the presence and hearing of the five named and undersigned witnesses, and I, Notary, wrote as it was dictated to me, Notary, by Marie Vempren Vicknair, the following last will and testament:
"To Mary Virginia Marino, wife of Joseph Georgel, I leave all that I die possessed of, both real and personal property.
"I appoint Bryan J. Lehmann, Jr., Attorney Norco, La. as Executor of this will, with seizin and without bond.
"The above and foregoing will and testament was written by me, Notary, *683 as dictated to me, Notary, by Marie Vempren Vicknair, in the English Language, and in the presence of the five undersigned and competent witnesses, and then read by me, Notary, to Marie Vempren Vicknair, in the English Language, and in the presence, and hearing of the five named and undersigned witnesses, all at the same and one time, without interruption and without turning aside to other acts.
"Signed on each page and declared by the testator above named, in our presence, to be her last will and testament, and she further expressly declares that she is unable to sign this testament due to her lack of ability to write the English Language, and in the presence of the testator and each other we hereunto subscribed our names this 10th day of February, 1955.
"Signed: (her)
 (X)
"Marie V. (mark) Vicknair
"S. D. Louviere Norco 
 St. Charles Parish
 Residence
"Frank T. Stewart Destrehan 
 St. Charles Parish
 Residence
"W. N. Kugler New Sarpy 
 St. Charles Parish
 Residence
"B. J. Lehmann Norco 
 St. Charles Parish
 Residence
"L. J. Vicknair LaPlace 
 St. John Parish
 Residence
"B. J. Lehmann, Jr., "Notary Parish of Saint Charles"
The italicized portions of the document quoted above are in the handwriting of the officiating notary public and the rest of the document is in typewriting.
Mrs. Vicknair's will is attacked on the grounds, first, that she did not sign the document or make her mark thereon, and, alternatively, should it be shown the mark is hers, then said mark was not affixed in conformity with law; second, that if the testatrix's mark is genuine, then it appears she signed as a witness rather than as testatrix; third, that she could not understand the English language; fourth, that the will is written both on the typewriter and in longhand and the handwriting could have been inserted therein out of the presence of the testatrix; fifth, that the testatrix could neither understand that portion of the will appearing in handwriting nor was she capable of dictating the disposition of her estate; and, sixth, that the said will having been made at the same place, on the same date, and at the same time as the will of Ludovic J. Vicknair, with Mary Virginia Marino Georgel instituted as universal legatee by both the said testatrix and said testator, renders both wills null and void as containing a reciprocal or mutual disposition contrary to LSA-C.C. art. 1572.
In the alternative, it is alleged the testatrix was in a comatose condition at the time of making her mark on the purported will as a result of being a "dope" addict.
In answer to the suit to annul the testaments, the universal legatee generally denied the allegations of the petition and averred affirmatively that the wills are valid under the law, and that she was duly instituted universal legatee in both testaments.
The matter proceeded to trial on the issues raised by the pleadings, and after hearing the testimony of fifteen witnesses, the trial judge concluded that both testaments were null and void and of no effect, for the reason the evidence showed that Mary Virginia Marino Georgel "did actually nurse and give loving care and attention to Mr. and Mrs. Ludovic J. Vicknair during their last illness up to the date of their death." The judge applied the doctrine set forth by the Supreme Court in Cormier v. Myers, 223 La. 259, 65 So.2d 345, as authority for his judgment.
*684 Mrs. Georgel appealed to the Supreme Court and the appeal has been transferred to us under the provisions of Art. VII, § 30, Const, of 1921, LSA.
At the outset we must notice exofficio that petitioners Arille Vicknair, Lionel Vicknair, Mrs. Bluette Vicknair Messina and Arsene Vicknair Duhe, the brothers and sister of Ludovic J. Vicknair, have no right to prosecute the suit and stand in judgment thereon for the reason they are not heirs at law of said decedent.
The inventory shows all property left by Mr. and Mrs. Vicknair to be assets of the community of acquets and gains which existed between them. They left neither children, other descendants, nor ascendants, and adopted no one. Therefore, under Art. 915, LSA-C.C., if Ludovic J. Vicknair's will and testament were to be annulled and he declared to have died intestate, his surviving wife, now herself deceased, would be adjudged to have inherited his undisposed of share of the community property in full ownership and the property so inherited would now belong to her estate. Said petitioners have no interest to seek the annulment of Ludovic J. Vicknair's will as its nullity would avail them nothing and they must be eliminated from the case. An action can be brought only by a person having a real and actual interest which he asserts. C.P. art. 15; LSA-C.C.P. art. 681. In Dazio v. Wainwright, La.App., 81 So.2d 96, 97, the court said:
"Absence of a real and actual interest may be taken advantage of at any time during the trial of the suit. Article 346 of the Code of Practice. Where a party litigant fails to produce evidence of interest the court by reason of Article 15 of the Code of Practice may take cognizance thereof and dismiss the claim even though the defendant did not file a formal exception. Otwell v. Vaughan, 1937, 186 La. 911, 173 So. 527; Tyler Co. v. Sutton, La. App.1951, 51 So.2d 401."
The allegations that Ludovic J. Vicknair's will does not conform to the legal requisites and conveys nothing, and the allegation that Marie Vempren Vicknair's mark was not affixed to her will in conformity with law, are nothing more than statements of conclusions of the plaintiffs. There are no allegations of facts as to what requirements were not observed. A mere conclusion of law of the pleader cannot stand as a ground for annulling a testament without being supported by allegations of fact from which the conclusions of law are drawn. Succession of Stafford, 191 La. 855, 186 So. 360.
There is no substantiation for the allegations that the testator and testatrix did not sign their respective wills; on the contrary, the signature on the olographic will and Mrs. Vicknair's mark on the other are abundantly proved.
It is urged, in the alternative, that if Mrs. Vicknair's mark appears on her testament, she did not subscribe thereto as testatrix but signed as a witness. The facts are that the mark and the signatures of the five witnesses and notary public all appear one under the other in the historic place for signatures, i. e. at the end of the document, Mrs. Vicknair's mark being first and the notary public's signature being last. Our attention has not been called to any law, and we know of none, which would require the signatures to be affixed in any other location or order.
No consideration should be given to the averment that the handwriting in Mrs. Vicknair's will "could have been inserted * * * out of the presence of" the testatrix. The allegation is meaningless and sets forth a possibility and not an actuality. However, in passing it can be stated the record adequately reflects that the handwriting is that of the notary and took place in the presence of the testatrix and the five witnesses.
The plaintiffs earnestly argue that Mrs. Vicknair could speak and understand *685 only French, and the testament being in English, she could not have understood it nor could she have dictated to the notary public the dispositive portion appearing therein. We are cognizant of the decisions of the Supreme Court to the effect that a will and testament is a nullity when executed by the notary public in a language the testator neither speaks nor understands. But that is not the case here. Two of the surviving witnesses and the notary public testified that Mrs. Vicknair made herself understood and told the notary public in general terms what disposition she desired made of her property, and appeared to understand the language in the testament when it was read back to her. It is not true that she could neither speak nor understand English. The testimony is to the contrary and establishes the fact that Mrs. Vicknair spoke "broken English" and could understand when English was spoken to her. One plaintiff said she spoke "just enough (English) to make you understand what she was saying." Another plaintiff stated Mrs. Vicknair understood English. He said she preferred to speak French and "when we spoke to her in English, she would answer in French." There is no room to admit the slightest doubt that the testatrix understood all that transpired in the notary's office and dictated the manner of disposing of her estate.
The purposes of the law are subserved by proof that the language employed by the testatrix was fully understood by the notary public and faithfully expressed in the testament. Succession of Cauvien, 46 La.Ann. 1412, 16 So. 309.
The mere circumstance that a nuncupative testament by public act contains words which were not dictated by the testator will not affect its validity when the notary public lucidly expresses the testator's intentions and faithfully records those intentions in the testament. Renfrow v. McCain, 185 La. 135, 168 So. 753. It is the identity of the thoughts and not the words which the law requires. Rostrup v. Succession of Spicer, 183 La. 1087, 165 So. 307.
The next attack leveled at both wills is that they were made "at the same place, date and time," both the testator and testatrix leaving all of their property to one and the same legatee "thus constituting but one will which is contrary to R.C.C. art. 1572." The article in question reads:
"A testament can not be made by the same act, by two or more persons, either for the benefit of a third person, or under the title of a reciprocal or mutual disposition."
The surrounding facts are that Mr. and Mrs. Georgel took Mr. and Mrs. Vicknair in the Georgel automobile from the Vicknair home to the office of Mr. Lehmann in Norco, Parish of St. Charles, a distance of about five miles. Mr. Lehmann had been the attorney and notary public for Mr. Vicknair since about 1952. He testified that about a week prior to February 10, 1955, Ludovic J. Vicknair came to his office stating his desire to make his will. Mr. Lehmann told him "get your wife to come back here next week."
After the parties arrived at the attorney's office, a conversation was held and Mr. Vicknair made known how he intended Mr. Lehmann to dispose of his property. Whereupon the attorney wrote on the typewriter the form of an olographic will containing the disposition the testator desired, and Mr. Vicknair in his own handwriting then copied on another sheet what the attorney had written. The olographic will probated herein and under attack by plaintiffs is that copy. The parties then repaired to an inner room used by Mr. Lehmann as his private office where Mrs. Vicknair executed her will. Five witnesses, one of whom was Mr. Vicknair, were present. Mrs. Georgel also went into the private office but Mr. Lehmann asked her to retire.
It is argued on plaintiffs' behalf that the confection of the two wills was but "one continuous act." Then follows the contention *686 there resulted a reciprocal and mutual will by intent of the parties. Pointed up as being significant is the fact the appointment with the attorney was made for both the testator and testatrix to make their wills at the same time.
The wills under attack do not come within the purview of LSA-C.C. art. 1572 which clearly provides a testament cannot be made by the same act by two or more persons either for the benefit of a third person, or under the title of a reciprocal disposition. We are not dealing here with a single act but with two disconnected, separate, and distinct documents different in form. Under no theory might it be determined there was one continuous procedure.
The Supreme Court had occasion to discuss LSA-C.C. art. 1572 in Wood v. Roane, 35 La.Ann. 865, wherein a husband and wife each executed a nuncupative testament by private act on the same day written by the same attorney, the husband executing his will first, followed by the confection of the wife's. There, as here, the wills were attacked as being in violation of "the law which forbids two or more persons from making a testament by the same act, for the benefit of a third person." The Court rejected the contention saying:
"The charge to invalidate the first will is, that, with the second will, it forms one and the same act, by which Wood and his wife have conjointly instituted the same person their universal legatee, in direct violation of Art. 1572, R.C.C. (C.N. 968).
"The two wills, although executed through the same agency, that is, written by the same person and consecrated before the same witnesses, are clearly the separate deeds of two different persons, and are unmistakably two distinct and independent acts, which are not amenable to the charge of conjunction, or unity of confection.
"It is only where two or more persons, by one and the same act or instrument, which is a unit, or entirety, from its beginning to its end, conjointly dispose of their property in favor of the same party or beneficiary, that the condemnatory provisions of the law can be applied. C.N. 968; Marcade IV, liv. I, Donations and Testaments, p. 3, on Art. 968 C.N.; Toullier 5, p. 380, Nos. 345, 347; Pothier, Test. ch. 1, Art. 1; Merlin Rept. 17, Test.Conj. No. 1, p. 812; Duranton 9, No. 8."
Next in order of consideration are the charges that the parties had not the mental capacity for making valid testaments in that Ludovic J. Vicknair was "in a comatose condition" and that Marie Vempren Vicknair was in a "comatose condition * * * for the reason that she was addicted to dope by reason of cancer * * *."
With reference to Ludovic J. Vicknair the only evidence adduced in plaintiffs' attempt to support the charge he was in a comatose condition emanated from several lay witnesses, some of them plaintiffs, which is to the effect that for a considerable period of time he had taken pills to relieve pain caused by a malady with which he was afflicted. None of these witnesses could state with the least degree of exactness the nature of the pills, how often they were taken, or how they affected the taker. Dr. Remy Gross, a pharmacist and practicing physician, the only expert witness called by plaintiffs, treated Ludovic J. Vicknair for several years for cancer of the prostate. When the patient's illness was well progressed, Dr. Gross began prescribing mild narcotics to give the patient comfort. It appears about the time Ludovic J. Vicknair wrote his will he was in the employ of the State of Louisiana at the vehicle weighing station situated near LaPlace, and during a normal day his job required him to weigh an average of 160 trucks, writing down their license numbers and recording the names and addresses of the drivers. He also entered the weight *687 of the vehicles on a report, checked for violations, and operated a police radio. Dr. Gross said such activities could not be performed by a person who did not possess his full mental faculties and that "as long as he worked he was competent." He was of the opinion that Ludovic J. Vicknair had the mental capacity to execute a will. Additionally, we have the testimony of Mr. Lehmann that the testator was rational when he wrote his will. But, even if we were to assume that the medication had an adverse effect on the testator's ability to think and act, nothing appears in the evidence showing he ingested any of the pills on the day the dispositions were made or when was the last time he did so.
Plaintiffs have made no semblance of a showing that Lucovic J. Vicknair lacked testamentary capacity.
Marie Vempren Vicknair was also a sufferer from cancer and was under treatment by Dr. Gross who prescribed the same kind of pills in her case. According to Dr. Gross: "There was not enough codeine to make either one of them an addict." Mrs. Vicknair was "a lot sicker" than her husband because in addition to the cancerous state, she was undergoing a cerebral softening resulting from severe hypertension. Dr. Gross "doubted" her capabilities of making a rational will within the year before she died.
Dr. Gross's testimony, we feel, is insufficient, both in substance and as to time, to overcome the presumption of sanity which clothed the testatrix. This is especially so in view of the testimony of the notary public and the two witnesses to the will who testified that the testatrix appeared to be rational and under no mental or other restraint. Moreover, had Mrs. Vicknair at times lacked testamentary capacity, either because of taking drugs or otherwise, which was never shown, it could well be that her disposition was executed during a lucid moment which would be a fact sufficient in law to uphold its validity.
Capacity to make a will is tested at the time of its making. Succession of Brugier, 146 La. 29, 83 So. 366; Succession of Heinemann, 172 La. 1057, 136 So. 51. All persons are presumed to be sane unless the contrary is affirmatively established, and a legal presumption exists in favor of the validity of the testament. Succession of Pizzati, 218 La. 549, 50 So.2d 189; Clanton v. Shattuck, 211 La. 750, 30 So.2d 823. The true test of a testator's competency is whether at the time of the confection of the will he was of sufficient mind to understand the nature of the testamentary acts and appreciate their effect. McCarty v. Trichel, 217 La. 444, 46 So.2d 621. A will executed by an insane during a lucid interval will be sustained. Succession of Crouzeilles, 106 La. 442, 31 So. 64; Succession of Ford, 151 La. 571, 92 So. 61; Succession of Mithoff, 168 La. 624, 122 So. 886.
In Succession of Angers, 205 La. 190, 17 So.2d 247, the evidence showed numerous doses of sedatives had been given the testator during his stay in a hospital and inaccuracies appeared in his mystic will executed in the hospital. The Supreme Court held this was insufficient to establish the want of testamentary capacity at the time of the execution of the will.
We cannot be persuaded Mrs. Vicknair's will is null by reason of testamentary incapacity.
The trial judge stated that the evidence adduced on the trial shows that the legatee "did actually nurse and give loving care and attention to Mr. and Mrs. Ludovic J. Vicknair during their last illness up to the date of their death." He believed the wills should be annulled under the views expressed by the Supreme Court in Cormier v. Myers, 223 La. 259, 65 So.2d 345. We believe our friend and brother below erred in his ultimate conclusion. There is absolutely no similarity between Cormier v. Myers and the instant case. In the cited case the testatrix was a woman *688 86 years old who was imposed upon by the defendant-legatee in whose home she lived and who was paid $100 a month to care for the testatrix. The testatrix was shown to be senile and had experienced severe progressive mental deterioration over a period of years. She could not recognize friends and relatives and had to be cared for like a child. The defendant made all the arrangements for the confection of the will which was drawn by her personal attorney who came to the defendant's home with a prepared memorandum of the bequests he had secured from the defendant over the telephone. The Court had little difficulty in concluding from the abundant evidence to that effect that the testatrix lacked testamentary capacity and held the disposition of her property was without legal effect. The Court pointed out that the public policy of this state, as expressed in Art. 1489, LSA-C.C., prohibits those who attend a sick person, or who wait on him professionally during his last illness, from benefiting from a donation inter vivos or mortis causa because of the influence they can exert over the ill. The Court went on to say that the keeper of a boarding house for the aged and infirm comes within the spirit of the codal article.
LSA-C.C. art. 1489 reads as follows:
"Doctors of physic or surgeons, who have professionally attended a person during the sickness of which he dies, can not receive any benefit from donations inter vivos or mortis causa made in their favor by the sick person during that sickness. To this, however, there are the following exceptions:
"1. Remunerative dispositions made on a particular account, regard being had to the means of the disposer and to the services rendered.
"2. Universal disposition in case of consanguinity.
"The same rules are observed with regard to ministers of religious worship."
While the trial judge found that Mrs. Georgel nursed and gave "loving care and attention" to Mr. and Mrs. Vicknair during their last illness, no such evidence appears in the record. We do not know what care the Georgels rendered except the feeding of the cow by Mrs. Georgel's husband and his helping of Mr. Vicknair in other ways. Mrs. Georgel said she called on the Vicknairs "all the time, off and on," but this would be expected as Mrs. Vicknair was her second cousin. There is no testimony establishing that Mrs. Georgel used duress, force or undue influence on the testator or testatrix.
In brief and in argument plaintiffs-appellees call attention to other informalities in the testaments which they contend are sufficient to warrant annulment. We have discussed every ground of nullity alleged by the plaintiffs in their petition and we do not think we should consider other grounds of nullity not declared upon. If certain forms are required to be observed in the confection of wills, the party who relies upon the lack thereof for annulment should precisely allege such informality. See per curiam in Succession of Pujol v. Manning, 221 La. 466, 59 So.2d 456, 458, wherein the Supreme Court said:
"In an application for a rehearing, appellants contend that their pleadings are broad enough to warrant consideration of their alternative contention that the testator lacked the capacity to make an olographic will. We do not so view the petition which, both by allegation and prayer, seeks an annulment of the will on the sole ground of forgery."
For the reasons assigned, the judgment appealed from is reversed and it is now ordered, adjudged and decreed that plaintiffs' suit be dismissed at their cost.
Reversed.