149 So.2d 218 (1963)
Succession of John W. WILLIS.
No. 9841.
Court of Appeal of Louisiana, Second Circuit.
January 2, 1963.
Rehearing Denied February 7, 1963.
Certiorari Refused March 15, 1963.
Theus, Grisham, Davis, Leigh & Brown, Monroe, Cotton & Bolton, Rayville, Captan Jack Wyly, Lake Providence, for opponents-appellants.
Coenen & Coenen, Rayville, for proponent-appellee.
Before GLADNEY, AYRES and BOLIN, JJ.
BOLIN, Judge.
This is an action by the collateral relatives and heirs at law of John W. Willis seeking to annul his statutory will and particularly a residual legacy in favor of Mrs. Lucille Thompson McKeithen, a registered nurse who regularly attended him for several years immediately preceding his death. From a judgment rejecting their demands, plaintiffs have appealed.
At the outset, we, as did the trial judge, express our sincere appreciation for the excellent assistance able counsel and amicus curiae have rendered the court by the submission of thorough and scholarly briefs. From our review of the record and briefs, we cannot refrain from commenting that not only the litigants, but counsel as well, have pursued the cause with such zeal that personal feelings and emotions are evident throughout the record. We make such observations not in the vein of criticism, but merely as a foundation for our conclusion that when the case is objectively viewed by an appellate tribunal of law, the issues are concise and the law rather clear.
John W. Willis was married but once and his wife, Emma, became seriously ill and died in January, 1956. During the last month of his wife's illness Mrs. Lucille McKeithen, a registered nurse, was employed to nurse her. Mr. Willis, whose health was not too good, employed the nurse to care for him after his wife died, and at his request, Mrs. McKeithen agreed to move into the Willis home and care for him for a weekly salary plus more or less making the Willis home her home. Pursuant to this agreement Mrs. McKeithen, *219 her husband and her mother moved into the Willis home in July, 1956 and remained there until testator's death on May 19, 1961. Subject to objection, the record is made voluminous with testimony that during Mrs. McKeithen's stay in the Willis home, she was not received too well by the Willis family and relatives. However, insofar as the issues of this case are concerned, for the reasons expressed later, we think most of such evidence has no bearing on this decision. For the purposes of this opinion, we may concede Mrs. McKeithen was in daily and almost constant attendance on Mr. Willis; she administered medicine, gave hypodermic injections and helped him run his household. We may further assume she was well liked by Mr. Willis but not well thought of by his relatives, neighbors and friends.
After assuming the above, we come now to the real crux of this case, which is whether any legal causes have been shown to justify annulment of the last will and testament of Mr. Willis particularly as it relates to a legacy to Mrs. McKeithen. Let us first consider the contention that Mrs. McKeithen is precluded from receiving a legacy under LSA-C.C. Art. 1489, the pertinent portion thereof being:
"Doctors of physic or surgeons, who have professionally attended a person during the sickness of which he dies, can not receive any benefit from donations inter vivos or mortis causa made in their favor by the sick person during that sickness. * * *"
It must be conceded Mrs. McKeithen is a registered nurse and in such capacity attended Mr. Willis during his illness. Whether the will was confected "during the sickness of which he died" is seriously contested and was made an issue below, and the trial judge decided that the evidence preponderated to establish that the will was not made during such sickness. However, for purpose of decision, let us concede arguendo she did attend him during the illness of which he died and that the will was made during that time. We are then squarely faced with the necessity of deciding whether a registered nurse is a "doctor of physic or surgeon" under the above codal article.
In deciding whether the courts should interpret LSA-C.C. Art. 1489 in such a manner as to exclude a person from being the recipient of a legacy, we feel we should get the entire problem in its proper perspective by considering LSA-C.C. Art. 1470 which provides:
"All persons may dispose or receive by donation inter vivos or mortis causa, except such as the law expressly declares incapable." (Emphasis supplied by this court.)
Our jurisprudence interpreting the above codal article is replete with cases holding the inherent right of a person to dispose of his property as he sees fit by last will and testament should not be interfered with by the courts unless clearly and expressly authorized by law. For example, in the rather old case of Kingsbury v. Whitaker, 32 La.Ann. 1055, at pages 1062-1063 (1880) the court expressed the principle in these strong but eloquent terms:
"The law, moreover, recognizes its own unfitness to regulate such dispositions. Its absolute rules of inheritance necessarily ignore the myriad circumstances which should properly exercise their influence over the distribution of the dead man's estate, such as the differences in condition, sex, age, infirmity, necessity, of those equally related, and the claims of friendship, love, services, favors and kind treatment. It also considers the protection and care secured for old age or infirmity by the possession of this salutary power. `It is one of the painful consequences of old age,' says Chancellor Kent, `that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives a man over the disposal of his property, is one of the most efficient means which he has, in *220 protracted life, to command the attentions due to his infirmity.'
"Van Alst v. Hunter, 5 John[s] Ch. (N.Y.) [148], 159.
"The desire thus to provide for his old age, and to secure such influence over his relatives and friends, is a just and efficient incentive to thrift and frugality; and to be able, even in the shadow of death, to extend his bounty to those whom he loves and who have loved and cherished him, is a consolation in a man's declining years of which he should not be lightly deprived.
"This hasty and partial review of the principles and motives underlying the freedom of testamentary disposition suggests and enforces the greatest reluctance on the part of enlightened courts to interfere with it. To wrest a man's property from the person to whom he has given it, and to divert it to others from whom he has desired to withhold it, is a most violent injustice, amounting to nothing less than post mortem robbery, which no court should sanction, unless thoroughly satisfied, either that the dispositions of the will are reprobated by law, or that the testator was legally incapable to make a will * * *"
With the admonition to consider the testament in a light most favorable to its validity and not to declare the testator or legatee incapable unless expressly authorized by law, is a registered nurse one of the persons included in LSA-C.C. Art. 1489? She is certainly not expressly included by name; only "doctors of physic or surgeons" and "ministers of religious worship" are so enumerated. It may be argued a registered nurse is very similar to a "doctor of physic", but appellants do not contend a nurse should be covered by the codal article under any such construction. Their contention is that even though the article in question reprobates only doctors and ministers by its express terms, the courts have extended the prohibition to all those who professionally attend the sick during their last illness, for the reason that "public policy" forbids such persons from being recipients of donations mortis causa, because of the influence they can exert over the ill and cite as authority therefor Cormier v. Myers, 223 La. 259, 65 So.2d 345 (1953); Succession of Vicknair (La.App. 4 Cir., 1961) 126 So.2d 680; Succession of Fisher, 235 La. 263, 103 So.2d 276 (1958).
The trial judge held these cases were not apposite and we agree. In none of the cited cases was the will nullified under LSA-C.C. Art. 1489. The gratuitous statements in the Cormier case, cited above, were repeated in the Fisher and Vicknair cases. As such remarks relate to LSA-C.C. Art. 1489 we interpret them to be dicta. Indeed we are unable to see how we could construe them otherwise. As we appreciate the term "public policy", it should only be used as an aid in interpretation of statutes or in cases where the intent or language is not clear or where the subject matter is not covered by positive law. To say that "public policy" could be utilized to add to or take away from an unambiguous codal article would be using it as a weapon for the courts to completely destroy the power of the legislative branch of our government by judicial legislation. As the vocation of nursing has been practiced since the early days of Christianity, the redactors of our civil code obviously did not intend to include nurses under Article 1489. Whether the lawmakers should have also listed nurses because they are in a position to exert the same influence over the ill as doctors is not a judicial question.
Next we pass to a consideration of whether the will should be set aside because of the testamentary incapacity of Mr. Willis. Pertinent to a consideration of this point are the following articles of the LSA-Civil Code:
Article 1472:
"It is sufficient if the capacity of giving exists at the moment the donation is made."

*221 Article 1475:
"To make a donation either inter vivos or mortis causa, one must be of sound mind."
Article 1492:
"Proof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation."
Relevant to this issue is the cited case of Cormier v. Myers, supra. There the evidence was overwhelming showing the lack of testamentary capacity. The will was made shortly before the death of the testatrix while she was in a nursing home. She had been suffering from senile dementia for a long time; she could not speak English, nor sign her name. Defendant, head of the nursing home and legatee under the will, procured her own lawyer to confect the will; witnesses testified the testatrix could understand only French, the Notary spoke only English, and the defendant had to act as interpreter at the confection of the will, as she alone could speak English and French. The court, under these circumstances properly nullified the will because of the testamentary incapacity of the party. The court, adopting the opinion of the lower court as its own, after lengthy discussion of all the facts and the Supreme Court cases relating to testamentary capacity, commenced the opinion with these words:
"While our law (Article 1492, [LSA-] C.C.) does not recognize duress, force or undue influence unless they are present at the making of the will, yet such incidents are evidence of the testamentary incapacity and mental weakness of the testatrix."
After discussing other evidence relating to incapacity the court went on to determine that issue, stating:
"Our jurisprudence is that the capacity to make a will is tested at the time the will is made, and that the presumption of sanity continues until proved otherwise.
"In this case it was proved entirely to my satisfaction that before, at the time of, and since the making of the will in question, the testatrix was of unsound mind, and lacked testamentary capacity."
And, after further discussion of two recognized types of insanity, the court concluded with the pronouncement in which appellants have found such comfort:
"The public policy of this State, as expressed in Article 1489 [LSA-]C.C., prohibits those who attend a sick person, or who wait on them professionally during their last illness, from benefiting by a donation inter vivos, or mortis causa, because of the influence they can exert over the ill. While the keeper of a boarding house for the aged and infirm is not included in this category by letter, the spirit is there. To establish the validity of a will made under the circumstances as described here would be establishing a dangerous precedent, and might encourage others charged with the care of the aged and infirm to prey upon their senility. A court must look upon such cases with grave suspicion, and must scrutinize the evidence and the circumstances with extreme care, to the end that the weak and incapable shall not be bent to the will of the greedy and the artful." (Emphasis supplied.)
In the Succession of Vicknair, cited supra, it was contended the testator was a dope addict and in a comatose condition and unable to make a will. The court decided he had testamentary capacity at the time the will was confected. Unfortunately the court also quoted the dictum in the Cormier case.
In the Succession of Fisher, cited supra, the court decided a Christian Science *222 Church was not precluded from receiving a legacy under LSA-Civil Code Article 1489. There the court repeated the dictum enunciated in the Cormier case but concluded it had no application to the case.
In the case at bar every available scrap of evidence tending to show senility, weakness, captation, undue influence and even fraud was allowed to be introduced but, even construed in the light most favorable of the opponents of the will the trial court was unimpressed and concluded that the will was made while the testator was of sound mind; was valid as showing the intent of the testator; and was not fraudulently induced.
As enjoined to do by the Cormier case, we have "scrutinized the evidence and the circumstances with extreme care", and have failed to find evidence of undue influence which would lead us to a conclusion the testator was mentally incapable at the time of confecting the will. The facts of the instant case show without any serious contention to the contrary that John W. Willis was of sound mind when the will was confected. He first executed a statutory will in November, 1956. In September, 1957, he decided to change the will principally so as to exclude one of his brothers. The evidence is clear that on this latter occasion he selected his own lawyer and went to his office where the will was confected. Mr. Trousdale, a highly respected member of the Monroe Bar, assisted in the preparation of the will. Another member of his firm and a secretary acted as witnesses, and all testified in the court below that the testator was apparently of sound mind. The medical testimony shows he was chronically ill at that time and was getting old, but that he suffered no real mental deterioration until early 1961, just prior to his death and some 3½ years after the will was made. The basic and fundamental contention is that he was under the domination of Mrs. McKeithen. Much evidence was introduced on this point, and we pretermit any further comment on same except to say it did not show mental incapacity but at most tended to show "captation or suggestion" which is not permitted under LSA-C.C. Art. 1492.
For the reasons assigned, the judgment appealed from is affirmed at appellants' costs.
Affirmed.
AYRES, J., dissents with written reasons.
AYRES, Judge (dissenting).
The action of the majority, in sustaining a universal or residual legacy contained in a bequest made by the testator during the illness of which he died, in favor of a registered nurse who professionally attended, cared for, and treated him during such illness and until he died, is predicated upon the propositions (1) that a registered nurse practicing her profession is not barred and precluded by the language of LSA-Civil Code Art. 1489 from receiving such a bequest, and (2) there was no proof of undue influence exercised by the beneficiary-nurse over the testator.
With these propositions, I am unable to agree, and, accordingly, respectfully dissent.
The conclusions reached in the majority opinion place, in my opinion, an unwarranted, narrow, and restricted construction upon the language of the aforesaid codal provision, which, so far as pertinent, reads as follows:
"Doctors of physic or surgeons, who have professionally attended a person during the sickness of which he dies, can not receive any benefit from donations inter vivos or mortis causa made in their favor by the sick person during that sickness. * * *"
Moreover, such conclusions are contrary to and inconsistent with the jurisprudence of this Statesuch conclusions are particularly repugnant to the pronouncements and holdings in the following cases: Cormier v. Myers, 223 La. 259, 65 So.2d 345, 350; *223 Succession of Fisher, 235 La. 263, 103 So.2d 276, 284; Succession of Vicknair, La.App. 4th Cir., 1961, 126 So.2d 680, 688 (writs denied).
In the Cormier case, Mr. Justice Ponder, late associate justice of the Supreme Court, in speaking for a unanimous court and in quoting, with approval, from the opinion of the trial judge, the Hon. Louis H. Yarrut, now of the Fourth Circuit, Court of Appeal, made the following appropriate pronouncement:
"The public policy of this State, as expressed in Article 1489 [LSA-]C.C., prohibits those who attend a sick person, or who wait on them professionally during their last illness, from benefiting by a donation inter vivos, or mortis causa, because of the influence they can exert over the ill. While the keeper of a boarding house for the aged and infirm is not included in this category by letter, the spirit is there. To establish the validity of a will made under the circumstances as described here would be establishing a dangerous precedent, and might encourage others charged with the care of the aged and infirm to prey upon their senility. * * *"
This principle was restated and reiterated by the Supreme Court in the Fisher case wherein Mr. Justice Hawthorne, as the author of the opinion (103 So.2d at p. 284), observed:
"* * * This court has stated that the public policy of this state, as expressed in Article 1489, prohibits those who attend a sick person, or who wait on the sick professionally during their last illness, from benefiting by a donation inter vivos or mortis causa, because of the influence they can exert over the ill. Cormier v. Myers, 1953, 223 La. 259, 65 So.2d 345."
In the Succession of Vicknair, the Court of Appeal for the Fourth Circuit again emphasized the public policy of this State as recognized by the Supreme Court in the Cormier case. In the course of its opinion (126 So.2d at p. 688), the court made this observation, in referring to the Cormier case:
"* * * The Court pointed out that the public policy of this state, as expressed in Art. 1489, LSA-C.C., prohibits those who attend a sick person, or who wait on him professionally during his last illness, from benefiting from a donation inter vivos or mortis causa because of the influence they can exert over the ill. The Court went on to say that the keeper of a boarding house for the aged and infirm comes within the spirit of the codal article."
The majority opinion recognizes the foregoing pronouncements as to the public policy of this State and assigns, as reasons for not following such pronouncements, that the pronouncements are gratuitous statements and only dicta. With this conclusion, I am also unable to agree. Regardless, however, the pronouncements made by the Supreme Court and emphasized by the Fourth Circuit are clear, positive, direct, and unambiguous statements as to the public policy of this State as expressed in the language of Art. 1489 of the Code. A registered nurse, therefore, comes clearly within the spirit of the codal article.
While the basis for the conclusions reached on the second of the aforesaid propositions is open to serious question, that is, as to whether the beneficiary-nurse actually influenced the testator in making his will and in constituting her a beneficiary of his estate, is a matter of no importance, the fact is that, by virtue of her employment as a nurse and her attendance upon and treatment of the testator in her professional capacity, she could and was in position to have so influenced him. One of the evils contemplated by the codal provision is the influence which can be exerted by one attending, caring for, and treating the sick. To discourage the exercise of such influence, the law wisely provides that *224 those who professionally attend a person during the sickness of which he dies cannot receive any benefit from donations, inter vivos or mortis causa, made in their favor by the sick person during that illness.
In regard to the foregoing, it may be pointed out that the nurse was employed at first to attend Mrs. Emma H. Willis, the testator's wife, at a hospital in Monroe. The testator was also in the hospital at the same time. After the wife's death, he was not able to view her body or to attend her funeral. The nurse continued, in the testator's employment, to attend, care for, and treat him. There was no cessation in this employment, which continued until he died. During her attendance upon the testator, the nurse preformed professional services requiring the application of the principles of nursing, including the supervision of the patient, observation of symptoms, and the administration of treatments and medication, including hypodermic injections as prescribed by an attending physician.
In addition to the performance of her professional duties, the nurse assumed, also, the management of the business affairs of her patient. She wrote and signed checks on his account for the payment of both medical and household expenses. For her services, the nurse was paid a salary of $100 per week, and she was furnished a residence for herself and family, which included her husband and her mother, together with all meals, without charge. An automobile was also provided for her use and for driving the testator where and when needed.
The nurse, November 15, 1956, took Willis from his residence to Monroe where he executed a first will in which the nurse was constituted a universal or residual legatee. Ten months later, September 12, 1957, the nurse again carried her patient to Monroe where he made a second will, the one herein involved. The nurse was again constituted a universal or residual legatee. This last will eliminated a brother of the testator as a legatee. By virtue of this change in the beneficiaries, the interest of the universal legatee was increased by one-seventh in the oil royalties forming a portion of the testator's estate.
There was no finding in the majority opinion as to whether the will was executed during the illness of which the testator died. Such fact was conceded for the purpose of giving consideration to the capacity of the nurse to receive under the testator's will.
However, from my appreciation and understanding of the record, there is no reasonable basis for doubt that the will was executed during the testator's last illness the illness of which he died. From the date of Mrs. Willis' death, about January 9, 1956, the nurse was in constant attendance upon Mr. Willis until the date of his death, May 19, 1961. The will was dated, as aforesaid, September 12, 1957. Therefore, that the will in contest was made during the sickness of which Mr. Willis died is a fact not open to serious dispute. The services of a registered nurse were constantly in demand by the testator during this entire period of time.
Nor can it be seriously disputed that the sickness or illness which ultimately resulted in his death was suffered by the testator at the time of the employment of the nurse and at the time the will was executed. A medical examination of Mr. Willis during May, 1955, disclosed a chronic illness identified as arteriosclerosis. This illness was apparently first manifested by a stroke sustained by Willis in 1951, the resulting condition of which had become chronic by 1955. This illness continued throughout the course of the nurse's employment and ultimately resulted in the testator's death.
It is my opinion that a nurse who professionally attends, cares for, and treats a person during the illness of which he dies cannot receive any benefit from a donation, inter vivos or mortis causa, made in her favor by the sick person during that illness, in view of the prohibitory language of Art. 1489 of the Code. I am further of the opinion *225 that the will in contest was made during the illness of the testator and of which he died, and, therefore, the bequest made by the testator in favor of his nurse is ineffective, null and void, and should have been so decreed.